[Cite as *In re D.B.*, 2018-Ohio-1247.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| In the matter of: | : | |
| [D.B.], | : | |
| | | Nos.   17AP-83 |
| | : | (C.P.C. No. 14JU-10576) |
| Alleged Delinquent Minor, | | 17AP-85 |
| | : | (C.P.C. No. 15JU-7944) |
| Appellant. | : | (REGULAR CALENDAR) |

D E C I S I O N

Rendered on March 30, 2018

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Katherine J. Press*, for appellee.  **Argued:** *Katherine J. Press*.

**On brief:** *Yeura R. Venters*, Public Defender, and *George M. Schumann*, for appellant.  **Argued:** *George M. Schumann*.

APPEALS from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

DORRIAN, J.

{¶ 1}  Defendant-appellant, D.B., appeals the January 3, 2017 judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, overruling his objections to a magistrate's decision adjudicating him a delinquent minor as a result of having committed the offenses of rape and gross sexual imposition.  For the reasons that follow, we affirm the judgment of the trial court.

I.  Facts and Procedural History

{¶ 2}  The charges against D.B., then 15 years old, were based on conduct toward his half-sister, A.B., who was five years old at the time.  Following an incident in which A.B.

attempted to touch a playmate in an inappropriate way, A.B. told her grandmother that D.B. had touched her in a similar manner. A.B.'s grandmother reported these comments to her daughter, A.B.'s mother, who contacted A.B.'s pediatrician. The pediatrician referred the matter to Nationwide Children's Hospital. A.B.'s mother and her father, M.B., who was also the father of D.B., took A.B. to Nationwide Children's Hospital on July 29, 2014 to be examined and assessed. During a forensic interview conducted by a social worker, A.B. stated that D.B. touched her breasts, her vagina, and her bottom. A.B. indicated D.B. touched her breasts and vagina over her clothing and under her clothing. When asked if D.B. ever touched her vagina with "something else," A.B. responded yes. (Jan. 4, 2016 Tr. at 47.) A.B. also answered yes when asked if she had ever seen someone's penis, but did not specifically identify whose. When asked whether someone's penis had ever touched somewhere on her body, A.B. answered "I would get away." (Jan. 4, 2016 Tr. at 53.) She answered no when the interviewer began to ask if she ever had to get away because somebody was trying to touch her with a penis. A.B. also stated that D.B. touched her breasts, her vagina, and her bottom with his mouth.

{¶ 3} Detective Monte Nommay of the Columbus Division of Police Special Victims Bureau received a referral on A.B.'s case from Franklin County Children Services and arranged with M.B. to bring D.B. to the child advocacy center ("CAC") for an interview on July 30, 2014 ("the July 30th interview"). D.B. was accompanied to the interview by his mother and M.B. After arriving at the CAC, D.B. was given the option of whether to speak with Detective Nommay alone or in the presence of his parents. D.B. chose to speak with the detective alone. During the July 30th interview, Detective Nommay did not advise D.B. of his constitutional rights or discuss having a lawyer present. Detective Nommay told D.B. that A.B. claimed some sexual conduct occurred and explained that he wanted to give D.B. an opportunity to tell his side of the story. D.B. denied having any sexual contact with A.B. At the July 30th interview, Detective Nommay discussed conducting a polygraph examination on D.B. with D.B., M.B., and D.B.'s mother. He later testified that D.B., M.B., and D.B.'s mother agreed to have D.B. participate in the polygraph examination.

{¶ 4} The polygraph examination was conducted on August 11, 2014 at Ohio State Highway Patrol headquarters by Trooper Timothy Errington ("the August 11th polygraph examination"). D.B. was accompanied to the polygraph examination by his mother and

M.B.  Prior to the examination, Trooper Errington explained the polygraph examination procedure to D.B. and his parents, and presented D.B.'s parents with a parental consent form. M.B. signed the parental consent form.  On the reverse side of the parental consent form was a polygraph examination release form which contained an explanation of the examinee's constitutional rights and an acknowledgment and waiver of those rights.  After taking D.B. into the room where the polygraph examination would be conducted, Trooper Errington reviewed the polygraph examination release form with D.B. and asked if he had any questions.  D.B. indicated he did not have any questions and signed the release form, indicating he waived his constitutional rights and agreed to participate in the polygraph examination.  During the polygraph examination, D.B. admitted touching A.B.'s vagina and breasts with his hands on multiple occasions, and to touching A.B.'s vagina with his mouth on multiple occasions.  D.B. also admitted trying to put his penis in A.B.'s vagina, but asserted it did not go far in.

{¶ 5}  On August 12, 2014, the day after the polygraph examination, Detective Nommay spoke with D.B. by telephone to discuss the results of the polygraph examination ("the August 12th telephone interview").  Detective Nommay did not advise D.B. of his constitutional rights during the telephone interview.  During the telephone interview, which lasted less than ten minutes, D.B. admitted to touching A.B.'s breasts and vagina, and to placing his mouth on A.B.'s vagina on multiple occasions.  He also admitted to attempting to put his penis in A.B.'s vagina on multiple occasions, but again asserted it did not go in very far.  After speaking with D.B., Detective Nommay spoke with D.B.'s mother and explained that D.B. would receive a summons to appear in court.

{¶ 6}  On August 18, 2014, a delinquency complaint was filed, charging D.B. with two counts of rape of a child under 13 years old (case No. 14JU-10576).  The first charge of the complaint in case No. 14JU-10576 alleged, that on July 1, 2014, D.B. committed rape through penile penetration of A.B., a five-year-old child.  The second charge of the complaint in case No. 14JU-10576 alleged that, on July 1, 2014, D.B. committed rape through cunnilingus on A.B.  Subsequently, on June 23, 2015, a second delinquency complaint was filed, charging D.B. with eight counts of rape of a child under 13 years old and four counts of gross sexual imposition, all involving A.B. (case No. 15JU-7944).  The 1st and 3rd charges of the complaint in case No. 15JU-7944 alleged D.B. committed rape

through oral penetration of A.B.'s vagina.   The 2nd and 10th charges alleged D.B. committed rape through digital penetration of A.B.'s vagina.[1]  The 4th and 5th charges alleged D.B. committed gross sexual imposition by fondling A.B.'s breasts.  The 6th and 9th charges alleged D.B. committed rape through digital penetration of A.B.'s anus.  The 7th and 8th charges alleged D.B. committed rape through oral penetration of A.B.'s anus.  The 11th and 12th charges alleged D.B. committed gross sexual imposition through mouth contact with A.B.'s breasts.   All the charges in case No. 15JU-7944 alleged the events occurred sometime between January 1 and December 31, 2014.

{¶ 7}   On August 4, 2015, a juvenile court magistrate issued a decision and entry dismissing the sixth, seventh, eighth, and ninth counts of the complaint in case No. 15JU-7944, alleging digital and oral penetration of A.B.'s anus, based on a finding that the charges were not supported by the information contained in the complaint.  On September 11, 2015, D.B. filed a motion to dismiss the remaining charges, alleging lack of probable cause, lack of sufficient notice, and vindictive prosecution.  That same day, D.B. filed a motion to suppress his statements to law enforcement and investigators, and any evidence obtained from those statements, alleging he did not knowingly, intelligently, and voluntarily waive his constitutional rights against self-incrimination.  Plaintiff-appellee, State of Ohio, filed a memorandum in opposition to D.B.'s motion to dismiss, asserting there was no vindictive prosecution and all charges were supported by probable cause, and that the complaint was sufficient to put D.B. on notice of the charges against him.   The state also filed a memorandum in opposition to D.B.'s motion to suppress, arguing no constitutional rights warning was required during D.B.'s initial interview because he was not in custody, and that his later statements either occurred after knowingly and voluntarily waiving his constitutional rights or in a non-custodial setting.  The juvenile court magistrate conducted a hearing on the motion to dismiss and motion to suppress on October 14, 2015.  Following the hearing, the magistrate issued a decision denying D.B.'s motion to dismiss and granting in part his motion to suppress.  The magistrate ordered the evidence related to the August

---

[1] The numbering of the offenses alleged in case No. 15JU-7944 is not sequential, setting forth offenses 1 through 5 on the first two pages of the complaint, then setting forth a second set of offenses 1 through 5 on the third and fourth pages of the complaint, and finally setting forth additional offenses 1 and 2 on the fifth page of the complaint. For purposes of clarity, we will refer to the 12 offenses contained in the complaint in case No. 15JU-7944 sequentially, as offenses 1 through 12.

11th polygraph examination be suppressed, but all other evidence and interviews would be admissible.

{¶ 8}   The state filed a motion to set aside the portion of the magistrate's order granting in part the motion to suppress.  On December 11, 2015, the juvenile court issued a judgment granting the state's motion to set aside, holding the magistrate erred as a matter of law by granting in part the motion to suppress.  The court found, based on the totality of the circumstances, that D.B. knowingly, intelligently, and voluntarily waived his constitutional rights at the August 11th polygraph examination, and that his statements after waiving those rights did not result from police coercion.  The court further concluded D.B. was not in custody during the July 30th interview or the August 12th telephone interview; therefore, no warnings regarding D.B.'s constitutional rights were required and any statements made by D.B. during those interviews were admissible.

{¶ 9}   The juvenile court magistrate conducted a trial on the merits over several days in December 2015 and January through March 2016, ending on March 2, 2016.  On April 27, 2016, the magistrate issued a decision adjudicating D.B. a delinquent minor on both charges in case No. 14JU-10576.  The same day the magistrate also issued a decision in case No. 15JU-7944, adjudicating D.B. a delinquent minor on the 2nd charge (alleging rape through digital penetration of A.B.'s vagina), the 4th charge (alleging gross sexual imposition through fondling A.B.'s breasts), and the 11th charge (alleging gross sexual imposition through mouth contact with A.B.'s breasts).  The magistrate dismissed the 1st and 3rd charges in case No. 15JU-7944, alleging rape through oral penetration of A.B.'s vagina, based on a finding there was no clear evidence those charges were not duplicates of the second charge in case No. 14JU-10576.  The magistrate also dismissed the 5th, 10th, and 12th charges in case No. 15JU-7944, finding there was no clear evidence those charges were not duplicates of the 2nd, 4th, and 11th charges in the complaint, respectively.

{¶ 10} On May 11, 2016, D.B. filed four objections to the magistrate's decision, asserting the magistrate erred as to the facts and law, and D.B.'s due process rights were violated.  As relevant to the present appeal, D.B.'s second objection asserted he did not knowingly, intelligently, or voluntarily waive his constitutional rights during the July 30th interview, the August 11th polygraph examination, or the August 12th telephone interview. D.B. argued all of his statements should have been suppressed for lack of knowing,

intelligent, and voluntary waiver of his constitutional rights.  In his fourth objection, D.B. asserted his statements should have been inadmissible due to lack of corpus delicti of the charges involving penetration of A.B. with his penis.

{¶ 11} On January 3, 2017, the juvenile court issued a judgment entry overruling D.B.'s four objections. With respect to D.B.'s second objection, the juvenile court reaffirmed its December 11, 2015 decision, which held that no constitutional rights warning was required during the July 30th interview or the August 12th telephone interview because D.B. was not in custody, and that D.B. knowingly, intelligently, and voluntarily waived his constitutional rights during the August 11th polygraph examination.  With respect to D.B.'s fourth objection, the juvenile court concluded A.B.'s statements were sufficient to satisfy the corpus delicti requirement, such that D.B.'s statements admitting to penile penetration of A.B. were properly admitted at trial.  The juvenile court adopted the magistrate's April 27, 2016 decisions dismissing certain charges and adjudicating D.B. a delinquent on other charges as an order of the court.

## II.  Assignments of Error

{¶ 12} Appellant appeals and assigns the following two assignments of error for our review:

> [I.] The juvenile court erred in finding that the child's *Miranda*[2] rights waiver was voluntary.
>
> [II.] The juvenile court erred in admitting the child's statements of penile penetration in the absence of a corpus delicti.

## III.  Discussion

{¶ 13} When objections are filed to a magistrate's decision, the juvenile court must undertake an independent de novo review of the matters objected to in order to "ascertain [whether] the magistrate has properly determined the factual issues and appropriately applied the law."  Loc.R. 40(D)(4)(d) of the Franklin County Court of Common Pleas, Domestic Relations Division, Juvenile Branch ("Juv.R. 40").

---

[2] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

**A. Denial of Motion to Suppress**

{¶ 14} In his first assignment of error, D.B. asserts the juvenile court erred by denying his motion to suppress. As explained above, the juvenile court concluded D.B.'s statements during the July 30th interview and the August 12th telephone interview were voluntary and no constitutional rights warnings were required because these interviews were not custodial interrogations. The court further concluded D.B.'s statements during the August 11th polygraph examination were admissible because D.B. was given a constitutional rights warning and knowingly, intelligently, and voluntarily waived his rights.[3] Although D.B.'s arguments on appeal focus primarily on the August 11th polygraph examination, his motion to suppress sought to exclude from the trial before the magistrate all his statements made during each of the three interactions with law enforcement. Accordingly, we will address the juvenile court's decision to admit D.B.'s statements during each interaction with law enforcement.

**1. Standard of review for a motion to suppress**

{¶ 15} Appellate review of a decision on a motion to suppress presents a mixed question of law and fact. *State v. Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, ¶ 32, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. An appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Burnside* at ¶ 8. "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*

**2. Constitutional right against self-incrimination and waiver of that right**

{¶ 16} The Fifth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution provide that no person shall be compelled to be a witness against himself in any criminal case. *State v. Arnold*, 147 Ohio St.3d 138, 2016-Ohio-1595, ¶ 30. *See also Cleveland v. Oles*, 152 Ohio St.3d 1, 2017-Ohio-5834, ¶ 8 (explaining that Fifth Amendment protection against self-incrimination applies to state proceedings pursuant to the Fourteenth Amendment to the United States Constitution). The United

---

[3] In overruling appellant's second objection, the juvenile court indicated it conducted an independent assessment of the evidence, including the evidence produced at trial before the magistrate. Accordingly, our review is not limited to the evidence presented at the suppression hearing, and we will also consider the evidence produced at trial when reviewing the trial court's decision according to D.B.'s assignments of error.

States Supreme Court has held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Under *Miranda*, "[a] suspect in police custody 'must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.' " *State v. Lather*, 110 Ohio St.3d 270, 2006-Ohio-4477, ¶ 6, quoting *Miranda* at 479.

{¶ 17} The procedural safeguards contained in *Miranda* apply when a suspect is subjected to custodial interrogation. *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, ¶ 26. The *Miranda* decision defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda* at 444. The United States Supreme Court has further clarified that custody is "a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508-09 (2012). The first step in determining whether a person is in custody is to ascertain whether, in light of the circumstances of the interrogation, a reasonable person would have felt he was not at liberty to terminate the interrogation and leave. *Id.* at 509. To determine how a suspect would have assessed his freedom of movement, courts must consider all the circumstances surrounding the interrogation, including: (1) the location of the questioning, (2) the duration of the questioning, (3) statements made during the interview, (4) the presence or absence of physical restraints during the questioning, and (5) the release of the suspect at the end of the questioning. *Id.* Freedom of movement is not a solely determinative factor, however, and courts must consider "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.*

{¶ 18} When a suspect is subjected to custodial interrogation that requires a *Miranda* warning, he may waive his constitutional right against self-incrimination, but the waiver must be voluntary and made with a full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it. *Lather* at ¶ 7. "A court may

infer from the totality of the circumstances that a defendant voluntarily, knowingly, and intelligently waived his rights." *State v. Valentine*, 10th Dist. No. 14AP-893, 2016-Ohio-277, ¶ 11, citing *State v. Clark*, 38 Ohio St.3d 252, 261 (1988), and *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, ¶ 52. The totality of the circumstances includes: (1) the accused's age, mentality, and prior criminal experience, (2) the length, intensity, and frequency of the interrogation, (3) the existence of physical deprivation or mistreatment, and (4) the existence of inducement or threat. *Valentine* at ¶ 11. "When the suspect is a juvenile, the totality of the circumstances includes 'the juvenile's age, experience, education, background, and intelligence' as well as his 'capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.' " *State v. Barker*, 149 Ohio St.3d 1, 2016-Ohio-2708, ¶ 24, quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979). "A juvenile's access to advice from a parent, guardian or custodian also plays a role in assuring that the juvenile's waiver is knowing, intelligent, and voluntary." *Barker* at ¶ 24.

{¶ 19} D.B. argues that because he was a 15-year-old child, the court must more closely scrutinize the circumstances surrounding the waiver of his constitutional rights. D.B. asserts that because M.B. is also the father of A.B., he had a significant conflict of interest and did not act in the role of a protective parent. Rather, D.B. claims, M.B. failed to properly ensure his rights were protected. D.B. argues the police coerced the waiver of his constitutional rights by relying on M.B.'s conflict of interest and, thus, the waiver was not voluntary. D.B. argues that, under the totality of the circumstances, the waiver of his constitutional rights was not voluntary, and the motion to suppress should have been granted.

{¶ 20} The United States Supreme Court has long held that careful scrutiny is required in cases involving criminal interrogation and waiver of constitutional rights by juveniles. *See Haley v. Ohio*, 332 U.S. 596, 599 (1948) ("[W]hen, as here, a mere child -- an easy victim of the law -- is before us, special care in scrutinizing the record must be used. Age 15 is a tender and difficult age for a boy * * *. He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens."); *Gallegos v. Colorado*, 370 U.S. 49, 54 (1962) ("[A] 14-year-old boy, no matter how sophisticated, is unlikely to have any conception of what

will confront him when he is made accessible only to the police. That is to say, we deal with a person who is not equal to the police in knowledge and understanding of the consequences of the questions and answers being recorded and who is unable to know how to protect his own interests or how to get the benefits of his constitutional rights."); *In re Gault*, 387 U.S. 1, 55 (1967) ("We appreciate that special problems may arise with respect to waiver of the privilege [against self-incrimination] by or on behalf of children, and that there may well be some differences in technique -- but not in principle -- depending upon the age of the child and the presence and competence of parents. * * * If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair."). Recently, the court held that "so long as [a] child's age was known to the officer at the time of police questioning, or would have been objectively apparent to a reasonable officer, its inclusion in the custody analysis is consistent with the objective nature of that test." *J.D.B. v. North Carolina*, 564 U.S. 261, 277 (2011). With respect to parental involvement, the Supreme Court of Ohio has held that, when assessing whether a juvenile knowingly, intelligently, and voluntarily waived his constitutional rights, "a key factor in the totality of the circumstances is the degree to which the juvenile's parent is capable of assisting and willing to assist the juvenile in the waiver analysis." *In re C.S.*, 115 Ohio St.3d 267, 2007-Ohio-4919, ¶ 110. In light of these special considerations that arise from D.B.'s age, we will consider whether the juvenile court properly denied the motion to suppress as to each interaction with law enforcement.

### 3. The July 30th interview

{¶ 21} The juvenile court found that the July 30th interview conducted by Detective Nommay was not a custodial interrogation and, therefore, no *Miranda* warning was required. D.B. claims his presence at the July 30th interview was not voluntary and a *Miranda* warning should have been given. D.B. asserts M.B. initiated the criminal investigation by taking A.B. to the hospital and that M.B. agreed with Detective Nommay to bring D.B. to the CAC for questioning. At the July 30th interview, Detective Nommay did not advise D.B. of his constitutional rights. D.B. claims the CAC was equivalent to a police station and he was unable to leave of his own volition. D.B. also points to the fact

that M.B. admitted at the suppression hearing that he did not consider obtaining an attorney for his son.

{¶ 22} To determine whether the July 30th interview was a custodial interrogation, we must consider whether a reasonable person in D.B.'s position would have felt he was at liberty to terminate the interview and leave. *Howes* at 509. This involves considering all the circumstances surrounding the interview, including: (1) the location of the questioning, (2) the duration of the questioning, (3) statements made during the interview, (4) the presence or absence of physical restraints during the questioning, and (5) the release of the suspect at the end of the questioning. *Id.*

{¶ 23} In similar cases involving interviews of juveniles, appellate courts have engaged in careful, fact-specific analysis to determine whether the interviews constituted custodial interrogation. The Fifth District Court of Appeals held that a police officer's interview with a 15-year-old child conducted at school in an assistant principal's office did not constitute a custodial interrogation. *In re M.B.*, 5th Dist. No. 15-COA-028, 2016-Ohio-4780, ¶ 44. The court noted the child was retrieved from class and taken to the assistant principal's office, where the police officer was present. The door to the office was closed, but not locked, and the assistant principal was present during the interview. The assistant principal explained to the child that the police officer was there to talk to the child, but that the child was not under arrest, was free to leave, and did not have to talk to the police officer. *Id.* at ¶ 37. At the beginning of the interview, the police officer reiterated that the child was not under arrest, was free to leave, and did not have to talk. *Id.* at ¶ 38. The appellate court distinguished the *J.D.B.* decision, noting that the police officer was not in uniform, and that he advised the child that he was not under arrest, did not have to talk, and was free to leave. *Id.* at ¶ 44. Under those circumstances, the court concluded, a juvenile in that situation would have felt he was not in custody and was free to terminate the interview.

{¶ 24} By contrast, the Third District Court of Appeals held that an interview of a 14-year-old child by a children services investigator and a police officer at a county children services office was a custodial interrogation. *In re T.W.*, 3d Dist. No. 9-10-63, 2012-Ohio-2361, ¶ 31. In that case, the child was transported by his mother to the children services office at the request of the children services intake investigator. *Id.* at ¶ 29. After arriving at the office, the child was removed from his mother and stepfather by the investigator and

the police officer and taken to an interview room; when the mother and stepfather tried to follow, the police officer advised them they were not allowed in the interview room. The door to the interview room was closed and either the investigator or the police officer sat near the door. *Id.* The court noted there were factors weighing against a finding that the child was in custody, including the fact that the interview occurred at a children services office rather than at a police station and that, prior to the interview, the police officer informed the child and his parents that he was not under arrest and was free to go. Additionally, the child was informed during the interview that he was not going to be arrested and was free to go that day. *Id.* at ¶ 30. However, based on the totality of the circumstances, the appellate court found the trial court did not err by finding the interview to be a custodial interrogation and granting the child's motion to suppress. *Id.* at ¶ 31.

{¶ 25} In the present case, there were factors suggesting that the July 30th interview was a custodial interrogation. Detective Nommay arranged with M.B. to bring D.B. to the CAC for the interview; thus, D.B.'s presence at the interview was not entirely of his own volition. The CAC was located in a secured building and the interview room was located in an area that required a security badge for access. M.B. testified that he agreed to bring D.B. to the CAC for the interview with Detective Nommay. M.B. admitted that, as the parent of both the victim and the accused, he wanted to determine the truth and did not consider obtaining an attorney for D.B. before the interview, nor did he discuss with D.B. whether D.B. wanted an attorney. M.B. admitted he let Detective Nommay "call the shots" with respect to the conduct of the interviews with D.B. (Oct. 14, 2015 Tr. at 80.)

{¶ 26} There were other factors suggesting that the July 30th interview was not a custodial interrogation. The interview was conducted at the CAC rather than at a police station. Both M.B. and D.B.'s mother accompanied D.B. to the interview. When they arrived for the interview, Detective Nommay gave D.B. the option of being interviewed with his parents present or alone, and D.B. chose to speak with Detective Nommay privately. Detective Nommay then escorted D.B. to an interview room in the CAC. Despite the fact that the interview room was located in a secured area, Detective Nommay testified that the interview room itself was not locked. Detective Nommay explained to D.B. he was not under arrest and did not have to answer questions if he did not want to, and that he would leave with his parents when the interview was over. When the interview ended, D.B. was

permitted to leave with his parents. Moreover, during the interview, D.B. denied having sexual contact with A.B.

{¶ 27} In the present case, unlike in *T.W.*, D.B. was given the option of having his parents present during the interview. D.B. was told he was not under arrest and did not have to answer questions. He was told he would leave the interview with his parents and he did. Balancing the various factors in this case, we cannot conclude that the juvenile court erred by holding that the July 30th interview was not a custodial interrogation. Thus, to the extent D.B. sought to suppress his statements during the July 30th interview, the juvenile court did not err by admitting those statements.

**4. August 11th polygraph examination**

{¶ 28} The juvenile court found that D.B. was in custody during the August 11th polygraph examination. The magistrate initially granted D.B.'s motion to suppress with respect to his statements during the August 11th polygraph examination, but the juvenile court granted the state's objection to the magistrate's decision, finding that D.B. knowingly, intelligently, and voluntarily waived his constitutional rights before submitting to the polygraph examination. On appeal, D.B. argues his statements during the August 11th polygraph examination should have been suppressed because his agreement to submit to the polygraph and waiver of his constitutional rights were not voluntary. D.B. claims M.B. made a joint agreement with Detective Nommay that D.B. would be required to take a polygraph. D.B. argues M.B. demanded that he submit to the polygraph. D.B. asserts that he received only a cursory explanation of his constitutional rights before the polygraph examination. He further argues the state trooper conducting the examination failed to ensure he understood his constitutional rights, despite his apparent difficulty in understanding the instructions for the polygraph examination. D.B. claims that, under the totality of the circumstances, the waiver of his constitutional rights was not voluntary.

{¶ 29} The Supreme Court has held that, using the totality of the circumstances test, a trial court may determine whether a juvenile understood his constitutional rights and voluntarily waived them in the absence of an interested adult or parent. *In re Watson*, 47 Ohio St.3d 86, 90 (1989). In *Watson*, the defendants were two boys ages 12 and 14. *Id.* at 86. On two separate occasions, police officers interviewed each of the defendants outside the presence of any parent, relative, or other interested adult. In each instance, the police

officers advised the defendants of their constitutional rights against self-incrimination. *Id.* at 87-88. During all the interviews, the defendants waived their rights, either by signing a written waiver of those rights or otherwise acknowledging their rights and agreeing to continue answering questions, and both defendants ultimately confessed to their involvement in the underlying crime. *Id.* While acknowledging the concerns arising from waivers of constitutional rights by juveniles recognized in *Gault*, the Supreme Court affirmed the trial court's denial of the defendants' motions to suppress. The court concluded the defendants' confessions were voluntary based on the fact that "they were apprised of their rights verbally and proceeded to execute waiver forms" and after considering the age and academic backgrounds of the defendants, their testimony, and the testimony of the interrogating officers. *Watson* at 90.

{¶ 30} Relying on the standard set forth in *Watson*, this court affirmed a trial court's denial of a motion to suppress a juvenile's confession in *State v. Mardis*, 134 Ohio App.3d 6 (10th Dist.1999). The defendant, a 15 year old who was charged with aggravated murder, asserted his confession should have been suppressed due to multiple factors including: "(1) he was fifteen-years-old at the time; (2) he had been awake for approximately twenty-four hours prior to the questioning; (3) he was held in a very small cell for approximately one hour; * * * (6) he was subject to interrogation 'in a very loud tone' which included allegations that he was lying; (7) his mother assisted the police in 'berating' him during the interrogation; and (8) both [the defendant] and his mother were visibly upset during the interview." *Id.* at 23-24. The detective conducting the interrogation arranged for the defendant's mother to be present, and at the beginning of the interview he reviewed a *Miranda* waiver form with the defendant and his mother. After indicating they understood his rights, both the defendant and his mother signed the form. *Id.* at 24. The court noted the defendant appeared to be in command of his faculties during the interrogation. He was in tenth grade in school and "stated that he averaged 'Bs' and 'Cs' in school." *Id.* The court concluded there was no indication the defendant was subjected to deprivation, mistreatment, or harsh conditions, nor that he was threatened or promised anything. Neither the length of the approximately one-hour interrogation nor its intensity was unreasonable. *Id.* Under these circumstances, the court concluded there was competent,

credible evidence to support the trial court's factual findings and that those findings satisfied the voluntariness standard. *Id.*

{¶ 31} By contrast, in a recent decision this court reversed a trial court's denial of a motion to suppress, finding that a juvenile defendant's waiver of his constitutional rights was not voluntary. *In re D.F.*, 10th Dist. No. 14AP-683, 2015-Ohio-2922. In that case, the defendant, who was 13 years old and had no criminal record, was unaccompanied by a parent or other interested adult when he was interrogated by a police detective. *Id.* at ¶ 24-25. When the detective entered the interrogation room carrying a copy of a *Miranda* waiver form, the defendant asked what it was. The detective explained that the form "got your Constitutional Rights or Waiver on it" and the defendant expressly stated "I don't know what that is." *Id.* at ¶ 18. The detective attempted to explain the waiver form in plain language, but never asked whether the defendant understood those rights. Additionally, the defendant never read the waiver form himself. After the detective read the waiver form to the defendant, he indicated that if the defendant wanted to talk with him it was necessary to sign the waiver form. *Id.* at ¶ 26. The court further found that the detective used deceptively misleading statements and inducements to cooperate. *Id.* at ¶ 27-28. Based on the totality of the circumstances, the court concluded the trial court erred by finding the defendant's confession to be voluntary. *Id.* at ¶ 35.

{¶ 32} In the present case, having D.B. undergo a polygraph examination was initially discussed at the time of the July 30th interview. Detective Nommay testified he spoke with M.B. about having D.B. take a polygraph examination, and M.B. agreed. Detective Nommay also spoke with D.B. individually about taking a polygraph examination and D.B. agreed. After the July 30th interview was complete, Detective Nommay had a second conversation with both of D.B.'s parents about the polygraph examination while D.B. was present. Detective Nommay testified that both M.B. and D.B.'s mother agreed that D.B. should participate in the polygraph examination. M.B. testified that he told D.B. that if he did not want to take the polygraph he should tell the truth immediately. M.B. admitted that, as the parent of both the victim and the accused, he wanted to determine the truth and was not worried about legal precautions at the time.

{¶ 33} M.B. and D.B.'s mother accompanied D.B. to the August 11th polygraph examination at Ohio State Highway Patrol headquarters. M.B. identified a parental consent

form he signed at the time of the polygraph examination allowing the test to be administered to D.B. M.B. testified he wanted D.B. to take the polygraph examination because he wanted to know what happened. He testified "I pretty much told [D.B.], you're going to take this polygraph test." (Oct. 14, 2015 Tr. at 106.) M.B. further testified "he didn't have no choice. I -- I told him what he was about to do." (Oct. 14, 2015 Tr. at 106.) M.B. testified "I wasn't giving him a choice" as to whether to go to the polygraph examination. (Oct. 14, 2015 Tr. at 107.) Neither M.B. nor D.B.'s mother was present in the room where the polygraph examination was conducted.

{¶ 34} Prior to the polygraph examination, Trooper Errington explained the procedure to D.B. and his parents. Trooper Errington presented M.B. and D.B.'s mother with a parental consent form, which M.B. signed. The form was a two-sided document, with a parental consent form on one side and a polygraph examination release and waiver form on the reverse side. The polygraph examination release and waiver form contained a *Miranda* warning. Trooper Errington testified he read the *Miranda* warning to D.B. and his parents.

{¶ 35} After taking D.B. into the polygraph examination room, Trooper Errington reviewed the polygraph examination release and waiver form containing the *Miranda* warning with D.B. a second time. Portions of a video recording of the polygraph examination were played for the magistrate at the hearing on the merits. The video recording, which was transcribed by the court reporter, reflected that Trooper Errington read the *Miranda* warning to D.B. and explained D.B.'s constitutional rights:

> Trooper Errington: I, [D.B.] voluntarily agree to be interviewed and/or submit to the polygraph truth verification examination to be conducted by the Ohio State Highway Patrol. I understand that I am not required to take this examination. I have the right to remain silent and anything I say may be used against me in a Court of Law. I have the right to talk to a lawyer for advice before answering any questions and have a lawyer present. I have the right to the advice or presence of a lawyer and the Court of Law will appoint me a lawyer if I cannot afford to hire one. I have the right to stop answering questions at any time. Do you understand all of that?
>
> [D.B.]: Yes, sir, I –

Trooper Errington: You don't have to talk if you don't want to. You don't have to talk to me and you can stop it at any time you want to. If you want to stop, if you want to talk to an attorney or talk to your parents, you just let me know, okay?

[D.B.]: Yes.

Trooper Errington: The bottom of the waiver again says I have read or have had read to me the statement and rights shown above that I understand what my rights are. I am willing to answer questions and or make a statement and I understand my rights at this time. Is that true so far?

[D.B.]: Yes.

Trooper Errington. Okay. It says I wish to state that I know what I am doing and I am taking this examination under my own freewill. Nobody is forcing you to come in here?

[D.B.]: No.

Trooper Errington: Okay. You wanted to come in here and do this?

[D.B.]: Yes

Trooper Errington: It says no force, duress --- that's people putting pressure on you, or undue influence, it's just, again, people putting pressure on you, your parents telling you got to go do this, whatever, was exercised of any kind to influence my decision to submit to this examination and I also agree to completely release and absolve the Ohio State Highway Patrol and any of it's [sic] employees from any and all liability connected in any way with this examination. Just saying you're not going to see [sic] me. Okay? If that's true I just need your signature right there for me, please.

(Jan. 6, 2016 Tr. at 39-41.)  Trooper Errington testified D.B. did not indicate he had any difficulty understanding the release and waiver form, and D.B. signed the form and indicated he would submit to the polygraph examination.  Trooper Errington testified that if a child does not consent to a polygraph examination and waive his constitutional rights, he will not conduct the examination, even if the parent has consented to it.  Trooper Errington testified D.B. never gave any indication he was unwilling to take the polygraph examination.  Trooper Errington then proceeded with the polygraph examination.

{¶ 36} During the preliminary portion of the polygraph examination, D.B. was unfamiliar with the term "ambition," when Trooper Errington asked about his greatest ambition. Trooper Errington testified on cross-examination that D.B.'s vocabulary seemed slightly below average for his age. He further testified that, based on his perception that D.B. was "a little bit slower" than children of comparable age whom he had examined, he slowed things down to be sure D.B. understood. (Jan. 19, 2016 Tr. at 58.)  However, when Trooper Errington asked D.B. about his grades in school, D.B. stated that he received "[m]ainly B[s] and C[s]." (Jan. 6, 2016 Tr. at 43.)  D.B. also seemed confused when, during the introductory portion of the polygraph examination, Trooper Errington asked him to pick a number from a series and intentionally lie about which number he had chosen.  On cross-examination, Trooper Errington testified that confusion about this part of the preliminary examination was not uncommon among individuals he had examined. However, when Trooper Errington asked D.B. about extenuating circumstances for a crime, giving an example of whether there was a difference between an individual stealing bread to feed his family or stealing an item to sell for drugs, D.B. appeared to understand the hypothetical scenario and agreed there was a difference.

{¶ 37} Under the totality of the circumstances in this case, based on the evidence presented at the suppression hearing and the hearing on the merits, the juvenile court did not err by admitting D.B.'s statements during the August 11th polygraph examination. Although M.B.'s testimony suggests a potential conflict of interest because he was the father of the accused and the victim and, thus, he could not fully function as an interested, protective parent for purposes of advising D.B., the Supreme Court has held that a juvenile may waive his constitutional rights in the absence of an interested adult or parent. *Watson* at 90.  The absence of advice from a parent or other interested adult is one factor to be considered in the totality of the circumstances, but is not determinative. *See State v. Pablo*, 10th Dist. No. 16AP-888, 2017-Ohio-8834, ¶ 15 (noting that the Supreme Court of Ohio rejected per se application of an interested adult rule for juvenile interrogations in *Watson*, but that the court has not forbidden consideration of whether the juvenile had access to independent advice from an interested adult under the totality of the circumstances test). In this case, D.B. was 15 years old and appeared to understand his constitutional rights as Trooper Errington explained them to him.  The video showed that D.B. appeared to read

along as Trooper Errington read the polygraph examination release and waiver form aloud to him. Although D.B. exhibited some confusion with the instructions for the polygraph examination, he did not appear to have any similar confusion regarding his rights or the fact that he could refuse to participate in the examination. D.B. was given an explanation of his rights and an opportunity to refuse to participate in the examination outside the presence of his father, thus reducing any improper influence that may have resulted from M.B.'s potential conflict of interest. Moreover, there was no evidence of physical deprivation or mistreatment, nor any threats or improper inducements. Based on these factors, the juvenile court did not err by concluding that D.B. knowingly, intelligently, and voluntarily waived his constitutional rights. Thus, to the extent D.B. sought to suppress his statements during the August 11th polygraph examination, the juvenile court did not err by admitting those statements.

**5. August 12th telephone interview**

{¶ 38} The juvenile court found that the August 12th telephone interview was not custodial and that no *Miranda* warning was required. D.B. argues Detective Nommay interrogated him during the August 12th telephone interview relying on statements made during the August 11th polygraph examination and failed to explain his constitutional rights. D.B. argues that, under the totality of the circumstances, his statements during the August 12th telephone interview were not voluntary because the interview was based on his prior involuntary admissions. Thus, D.B. appears to argue his statements during the August 12th telephone interview should have been suppressed as the fruit of the poisonous tree of the August 11th polygraph interview.

{¶ 39} Ohio courts have generally held that a conversation by telephone does not constitute a custodial interrogation that would require a *Miranda* warning, because there is no restraint of freedom and the conversation can be terminated at any time by hanging up the phone. *See State v. Kay*, 12th Dist. No. CA2012-01-007, 2012-Ohio-3426, ¶ 20 (holding that the defendant was not subjected to custodial interrogation when police officer called on his phone because he was "free to hang up the phone at any time and was under no obligation to answer Sergeant Jones' questions"); *State v. Dunn*, 2d Dist. No. 2008 CA 20, 2009-Ohio-3304, ¶ 19 (holding that "[s]tatements made during phone conversations do not occur as a result of a custodial interrogation, because there is no deprivation of

freedom of action and an individual can terminate the conversation at any time by hanging up the phone"); *State v. Simmons*, 8th Dist. No. 85297, 2005-Ohio-3428, ¶ 16 ("Moreover, statements made during phone conversations do not occur as a result of a custodial interrogation because there is no deprivation of freedom of action and an individual can terminate the conversation at any time by hanging up the phone."); *State v. Stout*, 42 Ohio App.3d 38, 41 (12th Dist.1987) (holding there was no custodial interrogation during a telephone call because "[a]ppellant was not under arrest or otherwise deprived of her freedom at the time of the conversation" and "[a]ppellant was under no compulsion to speak to Ritter and could have terminated the conversation at any time by simply hanging up the phone").

{¶ 40} The same reasoning applies to the August 12th telephone interview in this case. D.B. was under no obligation to speak with Detective Nommay and could have terminated the conversation at any time by hanging up the phone. We acknowledge that a juvenile might view this interaction differently than an adult and might be more prone to be deferential and unlikely to terminate the telephone call. However, in this case, the facts weigh against finding a custodial interrogation. There was no physical restraint of D.B.'s freedom, the telephone interview was relatively brief, lasting less than ten minutes, and D.B. remained free when the telephone interview ended. To the extent D.B. argues the August 12th telephone interview relied on statements he made during the August 11th polygraph examination that should have been suppressed, we reject this argument based on our holding the juvenile court did not err by admitting his statements from the August 11th polygraph interview.

{¶ 41} Accordingly, we overrule appellant's first assignment of error.

**B. Corpus Delicti Requirement**

{¶ 42} In his second assignment of error, D.B. asserts the juvenile court erred by admitting his statements that he put his penis into A.B.'s vagina. He argues the state failed to establish the corpus delicti of the crime of rape involving penile penetration independent of his admission of that act.

{¶ 43} The term corpus delicti refers to "the body or substance of the crime" which includes the act itself and the criminal agency of the act. *State v. Maranda*, 94 Ohio St. 364

(1916), paragraph one of the syllabus.  The Supreme Court further explained the corpus delicti rule in *Maranda*:

> It has long been established as a general rule in Ohio that there must be some evidence outside of a confession, tending to establish the *corpus delicti*, before such confession is admissible. The *quantum* or weight of such outside or extraneous evidence is not of itself to be equal to proof beyond a reasonable doubt, nor even enough to make it a *prima facie* case. It is sufficient if there is *some* evidence outside of the confession that tends to prove *some* material element of the crime charged.

(Emphasis sic.)  *Id.* at paragraph two of the syllabus.  The evidence necessary to satisfy the corpus delicti rule need not be direct and may be circumstantial.  *State v. Russell*, 10th Dist. No. 09AP-226, 2009-Ohio-5130, ¶ 6, citing *State v. Nicely*, 39 Ohio St.3d 147, 152 (1988).

{¶ 44} This court rejected the argument of a defendant who had been convicted of one count of rape and one count of gross sexual imposition of a minor child in a similar case.  *State v. Edinger*, 10th Dist. No. 05AP-31, 2006-Ohio-1527, ¶ 24.  The defendant claimed the trial court erred by admitting his confession because the state failed to satisfy the corpus delicti rule.  *Id.*  The court noted the state had introduced evidence of the following facts: (1) the child's age at the time of the alleged crime, (2) she was not the defendant's spouse, (3) the defendant lived with the child and her mother during the relevant time period, (4) the child made statements to her father that prompted him and her mother to call police and, based on that information, the child was referred for a medical examination, and (5) based on the statements the child made, a complete physical examination was conducted and she was tested for sexually transmitted diseases. *Id.* at ¶ 28.  The court found these factors constituted sufficient evidence of the corpus delicti of the crimes for the defendant's confession to be admitted.  *Id.* at ¶ 32.

{¶ 45} Similar to *Edinger*, in the present case, the state introduced evidence of A.B.'s age and the fact that she engaged in conduct and made comments that led her family to seek medical evaluation.  Moreover, although A.B. did not expressly state D.B. touched her with his penis during the forensic interview, she admitted that D.B. touched her with his hand and "something else." (Jan. 4, 2016 Tr. at 47.) Under these circumstances, the state satisfied the corpus delicti requirement by introducing some evidence outside of D.B.'s

confession tending to prove some element of the crime of rape by penile penetration.  *See Maranda* at paragraph two of the syllabus.

{¶ 46} Accordingly, we overrule appellant's second assignment of error.

## IV.  Conclusion

{¶ 47} For the foregoing reasons, we overrule D.B.'s two assignments of error and affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

BRUNNER and HORTON, JJ., concur.

_____