[Cite as *In re N.D.*, 2024-Ohio-5779.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| [N.D.], | : | No. 22AP-552 |
| | | (C.P.C. No. 20JU-9384) |
| Appellant. | : | (REGULAR CALENDAR) |
| | : | |

D E C I S I O N

Rendered on December 10, 2024

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Paula M. Sawyers*, for appellee.

**On brief:** *Mitchell A. Williams*, Public Defender, and *Robert D. Essex*, for appellant.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

DORRIAN, J.

{¶ 1} Defendant-appellant, N.D., appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, overruling his objections to magistrate's decisions denying his motion to suppress evidence and adjudicating him a delinquent minor as a result of having committed the offense of reckless homicide. For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} On the evening of September 18, 2020, N.D., who was 15 years old, was at his Reynoldsburg home with his 16-year-old brother, and his two half-brothers, who were 7 and 4 years old. Shortly before 7:30 p.m., the 4 year old, K.A., entered the bedroom shared by N.D. and the 16 year old. K.A. picked up a handgun ("gun") that was lying on the floor.

Tragically, the gun fired and the bullet struck K.A. in the forehead.  K.A. was transported to the hospital and died three days later.

{¶ 3}    After hearing the shot, the 16 year old ran into the bedroom; he picked up K.A. and carried him outside the house, calling for help.  N.D. called 911, then picked up the gun and carried it downstairs.  N.D. tossed the gun onto a pile of bags in the living room and then ran to a friend's house two streets away.  Reynoldsburg police officers located N.D. at his friend's house and took him into custody.  Reynoldsburg Police Detective Timothy Doersam interviewed N.D. at the Reynoldsburg police station.

{¶ 4}    N.D. was charged in juvenile court with delinquency for having committed the offense of reckless homicide, a third-degree felony.  The complaint alleged N.D. recklessly left a gun on the floor in a location accessible to K.A. and that K.A. used the gun to shoot himself in the head, which caused his death.  N.D. moved to suppress statements he made to police, claiming those statements were obtained in violation of his constitutional right against self-incrimination.  N.D. acknowledged that he waived his rights, but asserted the waiver was not made voluntarily, knowingly, and intelligently.

{¶ 5}    A juvenile court magistrate conducted a hearing on the motion to suppress on October 4, 2021.  Reynoldsburg Police Officers Mikayla Relli and Juwaun Patterson, and Detective Doersam, testified at the suppression hearing.

{¶ 6}    Officer Relli testified she verbally advised N.D. of his constitutional rights to remain silent and to an attorney after he was detained and taken from his friend's house.  N.D. indicated he understood his rights and waived them.  N.D. did not ask for a parent before speaking to Officer Relli about the incident.  Officer Patterson observed Officer Relli advising N.D. of his constitutional rights and testified that N.D. verbally indicated he understood his rights.  After N.D. was detained, a man claiming to be his uncle approached and tried to speak with him.  Officers advised the man that he was not allowed to speak with N.D. at the time and escorted him away.  Officer Patterson, who transported N.D. to the Reynoldsburg Police station, testified that N.D. asked to speak to his mother about the incident while waiting to be interviewed.

{¶ 7}    Detective Doersam began his interview of N.D. at 10:18 p.m. on September 18, 2020. Detective Doersam read a written explanation of N.D.'s constitutional rights to him and N.D. signed a waiver indicating he voluntarily wished to participate in the

interview. Prior to explaining N.D.'s rights, Detective Doersam stated he could not promise that N.D. would not be charged with a crime arising from the incident. Detective Doersam advised N.D. he had the right to an attorney and the right to have a parent present during questioning. N.D. asked about his mother and was told she was at the hospital with K.A. N.D. also asked whether his father was at the police station; Detective Doersam informed N.D. that his father was at the station. Detective Doersam also advised N.D. that even if he chose to answer questions, he also had the right to change his mind and stop participating in the interview. After reviewing a written document explaining his rights, N.D. signed a waiver of those rights and agreed to speak with Detective Doersam.

{¶ 8} The juvenile court magistrate issued a decision denying N.D.'s motion to suppress. The magistrate conducted a trial on December 13 and 15, 2021, and March 7, 2022. Detective Doersam and Detective Nicole Riley testified at trial.

{¶ 9} After being detained, N.D. told an officer that he and his 16-year-old brother were downstairs smoking when they heard the gunshot. They both ran upstairs and saw K.A. lying on the floor. The 16 year old picked up K.A. and carried him downstairs. N.D. picked up the gun and carried it downstairs, before tossing it down on bags in the living room. N.D. called 911 and told the dispatcher that his brother had been shot. N.D. gave the address to the dispatcher but did not remain on the line after the Columbus-based dispatcher transferred the call to a Reynoldsburg-based dispatcher. N.D. then ran to a friend's house for help.

{¶ 10} Reynoldsburg police officers recovered a purple and black .22 caliber gun from on top of bags in the living room. There was clear packing tape holding the gun magazine in place and there were bullets in the magazine. The officers found "some bedding items inside the closet and a large area rug on the floor" in N.D.'s bedroom. (Trial Ex. A, Det. Nicole Riley narrative incident report.)

{¶ 11} In the interview with Detective Doersam, N.D. stated that before the incident he and his 16-year-old brother were in their bedroom together using Instagram Live on N.D.'s cell phone. After they finished using the app, both of them left the room. N.D. went downstairs briefly and then returned to the bedroom. N.D. admitted he had the gun in his pocket while using Instagram Live, but claimed he placed the gun under a pillow on the floor behind him after he returned to his bedroom. N.D. asserted he was using his phone,

facing away from the bedroom door, when he heard the gunshot. He claimed K.A. was not in the bedroom when he returned from downstairs and did not know when K.A. entered the room. N.D. stated that he normally used a broken piece of a table to block his door but had not done so this time; he believed the bedroom door was open after he returned to the room. N.D. claimed he usually told his little brothers to stay out of his bedroom.

{¶ 12} N.D. claimed that after hearing the gunshot he turned and saw K.A. with the gun in his hand. N.D. took the gun, ran downstairs, and called 911. He stated he ran to his friend's house because he did not know what to do.

{¶ 13} N.D. told Detective Doersam he had borrowed the gun approximately four days earlier from a woman he knew. N.D. claimed he obtained the gun because his 16-year-old brother needed it for protection. N.D. denied ever firing the gun; he believed there were rounds in the magazine, but not a round in the chamber.

{¶ 14} N.D.'s mother told Detective Riley that one year earlier she had heard rumors that N.D. and his older brother had a gun. She confronted them and they denied it. N.D.'s mother requested assistance from the sheriff's department to help her look for a gun in her house, but no gun was found at the time.

{¶ 15} Detective Doersam performed a forensic examination of N.D.'s cell phone. N.D.'s cell phone contained photographs of him with the purple and black gun dated as early as August 24, 2020, nearly one month before the incident. The forensic examination also revealed photographs and videos of N.D. with other firearms.

{¶ 16} At the close of plaintiff-appellee's case, State of Ohio, N.D.'s counsel moved for acquittal under Crim.R. 29, asserting the evidence was insufficient to sustain a conviction for reckless homicide. Ultimately, the magistrate denied the Crim.R. 29 motion, concluding the state presented sufficient evidence to establish the elements of reckless homicide.

{¶ 17} The magistrate issued a judgment entry adjudicating N.D. a delinquent minor for having committed the offense of reckless homicide. The entry placed N.D. on community supervision with specified conditions. N.D. filed objections to the magistrate's decision in which he objected to the denial of his motion to suppress and the denial of his Crim.R. 29 motion and adjudication as a delinquent minor.

{¶ 18} After conducting a hearing on the objections, the juvenile court issued a decision overruling N.D.'s objections and adopting the magistrate's decisions denying his motion to suppress and adjudicating him to be a delinquent minor.

## II. Assignments of Error

{¶ 19} N.D. appeals and assigns the following two assignments of error for our review:

> [I.] The trial court erred in overruling the appellant's objection to the magistrate's decision, which had overruled his motion to suppress statements given in violation of his rights under the Fifth and Fourteenth Amendments to the U.S. Constitution and Article I, Section 10 of the Ohio Constitution.
>
> [II.] [Appellant's] right to due process of law was violated when the court adjudicated him delinquent of reckless homicide (F-3) where the evidence was legally insufficient as to each and every element of the offense.

## III. Discussion

### A. Standard of review

{¶ 20} The standard of review on appeal from a trial court judgment adopting a magistrate's decision varies based on the issues that were: (1) preserved for review through objections before the trial court, and (2) raised on appeal through assignment of error. *In re A.S.*, 10th Dist. No. 20AP-18, 2020-Ohio-5490, ¶ 18. Therefore, we will address the specific standard of review as to each of N.D.'s assignments of error individually.

### B. Denial of N.D.'s motion to suppress

{¶ 21} N.D. asserts in his first assignment of error that the trial court erred by overruling his objection to the magistrate's decision denying his motion to suppress statements he made to police. N.D. argues he did not voluntarily, knowingly, and intelligently waive his constitutional right against self-incrimination.

### 1. Standard of review

{¶ 22} Appellate review of a trial court's decision on a motion to suppress presents a mixed question of law and fact. *In re D.B.*, 10th Dist. No. 17AP-83, 2018-Ohio-1247, ¶ 15, citing *State v. Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, ¶ 32. We review the trial court's findings of fact to determine if they are supported by competent, credible evidence.

*Id.*   We then independently determine whether the facts satisfy the applicable legal standard, without deference to the trial court's conclusion.  *Id.*

## 2. Constitutional right against self-incrimination and waiver of that right

{¶ 23} The Fifth Amendment to the United States Constitution provides that no person shall be compelled to be a witness against himself in a criminal proceeding.  This protection is applicable against the states through the Due Process Clause of the Fourteenth Amendment to the United States Constitution.  *State v. Johnson*, 163 Ohio App.3d 132, 2005-Ohio-4243, ¶ 44 (10th Dist.), citing *Malloy v. Hogan*, 378 U.S. 1 (1964).  Article I, Section 10 of the Ohio Constitution affords similar protection against self-incrimination. *Id.*  " '[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.' " *D.B.* at ¶ 16, quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  A suspect in police custody must be given a *Miranda* warning, advising him prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that, if he cannot afford an attorney, one will be appointed for him prior to any questioning if he wishes.  *Id.*

{¶ 24} An individual may waive the right against self-incrimination but the waiver "must be voluntary and made with a full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it." *D.B.* at ¶ 18.  We consider the totality of the circumstances when determining whether a valid waiver occurred, including: "(1) the accused's age, mentality, and prior criminal experience, (2) the length, intensity, and frequency of the interrogation, (3) the existence of physical deprivation or mistreatment, and (4) the existence of inducement or threat." *Id.*

{¶ 25} Careful scrutiny is required when determining whether a juvenile voluntarily waived his constitutional rights.  *Id.* at ¶ 20.  As the United States Supreme Court has noted, a 15-year-old boy "cannot be judged by the more exacting standards of maturity" because "[t]hat which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens." *Haley v. Ohio*, 332 U.S. 596, 599 (1948).  "When the suspect is a juvenile, the totality of the circumstances includes 'the juvenile's age, experience, education, background, and intelligence,' as well as his 'capacity to understand the warnings given

him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.' " *State v. Barker*, 149 Ohio St.3d 1, 2016-Ohio-2708, ¶ 24, quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979). "A juvenile's access to advice from a parent, guardian or custodian also plays a role in assuring that the juvenile's waiver is knowing, intelligent, and voluntary." *Id.*

{¶ 26} Analyzing the totality of the circumstances, this court affirmed denials of motions to suppress in the *D.B.*, 2018-Ohio-1247, and *A.S.*, 2020-Ohio-5490, cases. In the *D.B.* case, the juvenile was 15 years old when his parents accompanied him to Ohio State Highway Patrol headquarters to participate in a polygraph examination. *D.B.* at ¶ 33. The juvenile's mother signed a parental consent form for the polygraph and a state trooper read a *Miranda* warning to the juvenile and his parents. *Id.* at ¶ 34. The trooper then took the juvenile into the examination room and read the *Miranda* warning a second time. *Id.* at ¶ 35. The juvenile agreed to waive his constitutional rights and participate in a polygraph examination. *Id.* at ¶ 37. The court noted that the juvenile appeared to read along as a state trooper read the polygraph examination release and rights waiver form to him. Although the juvenile exhibited some confusion about the instructions for the polygraph examination, he did not demonstrate similar confusion about his constitutional rights. *Id.* We further found there was no evidence of physical deprivation or mistreatment, nor any threats or improper inducements. *Id.*

{¶ 27} In the *A.S.* case, police unsuccessfully attempted to contact the juvenile's parents before beginning an interview. *A.S.* at ¶ 23. The juvenile was 15 years old and told the interviewing officer he was doing well in school. A video recording established the juvenile "understood the rights as read to him by the detective, and [he] was alert and engaged during the interview." *Id.* The interviewing detective "made no overt threats, raised his voice, or coerced information from [the juvenile]," and there was no evidence of physical deprivation or mistreatment. *Id.* The juvenile did not sign a written waiver of his constitutional rights, but the court found that the detective verbally read the warning and asked the juvenile several questions to ensure he understood his rights before beginning the interview. This court found that "[t]he fact that no parent was present during the interview is not enough to conclude [the juvenile] did not knowingly and intelligently waive his rights." *Id.*

{¶ 28} By contrast, in *In re D.F.*, 10th Dist. No. 14AP-683, 2015-Ohio-2922, this court found that a juvenile did not knowingly and voluntarily waive his constitutional rights. There the juvenile was 13 years old and had completed the sixth grade. *D.F.* at ¶ 19. He had no prior criminal record. *Id.* at ¶ 24. The interrogation began at 3:56 a.m., and when it began the juvenile complained about being cold. *Id.* at ¶ 16. The interviewing detective did not respond to that complaint. When the juvenile asked whether his parents had been contacted, the detective stated the number was disconnected. *Id.* at ¶ 17. When the juvenile asked if he would be able to go home, the detective answered, "[n]o * * * [y]ou're going to jail." *Id.* When the juvenile asked "[f]or how long," the detective responded, "I don't know * * * [t]hey can keep you till you're 21 if they wanted to." *Id.* The detective then left the room and returned with a piece of paper. The juvenile asked what was on the paper; the detective responded it was a "Constitutional Rights or Waiver" form and the juvenile said, "I don't know what that is." *Id.* at ¶ 18. The detective attempted to explain the constitutional rights in plain language and then read the form to the juvenile. *Id.* The detective then told the juvenile to read the form and indicated he needed to sign the rights waiver "right now" if he wanted to talk to the detective. The juvenile signed the waiver without reading it. *Id.*

{¶ 29} This court concluded it was unclear that the juvenile in *D.F.* understood the nature of his constitutional rights or the significance of waiving them. *Id.* at ¶ 24. "The detective never asked whether [the juvenile] understood his constitutional rights, and evidence of such understanding, other than [his] signature on the waiver form, [was] absent from the record." *Id.* at ¶ 26. The court further concluded that the detective "used deceptively misleading statements, combined with inducements to cooperate, that served to deprive [the juvenile] of his capacity to intelligently and voluntarily waive his rights in the absence of an interested adult or parent." *Id.* at ¶ 27. We also noted that the juvenile was held for four hours before being read his *Miranda* rights, the interview began at almost 4:00 a.m., and there was no evidence the juvenile was fed or offered any drink at any point after his arrest. Considering the totality of the circumstances, the court concluded the juvenile did not voluntarily waive his constitutional rights and confess to the offenses. *Id.* at ¶ 35.

### 3. Whether N.D. validly waived his constitutional right against self-incrimination

**{¶ 30}** In this case, the gravamen of N.D.'s suppression claim is that his waiver was not voluntary, knowing, and intelligent because he was not allowed to consult with a parent before waiving his rights or have a parent present during the interview. N.D. asserts that Detective Doersam did not attempt to contact his parents and did not ask N.D. whether he wanted to speak with one of his parents, despite knowing that his father was present at the police station when the interview began.[1]

**{¶ 31}** "The state of Ohio has declined to join other states that provide per se rules that invalidate a juvenile's *Miranda* waiver without additional protections, such as requiring a parent or guardian present, during an interrogation." *A.S.* at ¶ 22, citing *State v. Barker*, 1st Dist. No. C-130214, 2016-Ohio-7059, ¶ 13, fn. 1. *See also In re Watson*, 47 Ohio St.3d 86, 89-90 (1989) (rejecting the "independent advice/interested adult standard" adopted by some other states); *State v. Bell*, 48 Ohio St.2d 270, 276-77 (1976), *rev'd on other grounds*, *sub nom. Bell v. Ohio*, 438 U.S. 637 (1978) ("We perceive no requirement in *Miranda* that the parents of a minor shall be read his constitutional rights along with their child, and that, by extension, both parent and child are required to intelligently waive those rights before the minor makes a statement."); *State v. Stewart*, 176 Ohio St. 156, 159-60 (1964) ("To find that [the juvenile's confession] was inadmissible, we would have to hold that any confession made by a person who is not yet 18 years old is involuntary unless one of [the juvenile's] parents or [the juvenile's] attorney is present. This is not the law.").

**{¶ 32}** Rather than a per se rule, the Supreme Court of Ohio has consistently applied the totality-of-the-circumstances test to evaluate the validity of a juvenile's waiver of constitutional rights. *Barker*, 2016-Ohio-2708, at ¶ 24; *In re C.S.*, 115 Ohio St.3d 267, 2007-Ohio-4919, ¶ 108, citing *In re Dalton S.*, 273 Neb. 504, 514 (2007) ("We agree with the Supreme Court of Nebraska's recent holding that a totality-of-the-circumstances analysis is the proper test to be used in ascertaining whether there has been a valid waiver of counsel by a juvenile."); *State v. Carder*, 9 Ohio St.2d 1, 9-10 (1966) (applying totality-of-the-circumstances test to determine whether confession made by juvenile defendant

---

[1] Although the timing is not exactly clear from the record, it appears N.D.'s father may have left the police station at some point during the interview because N.D. had to wait after the interview ended before being released.

should have been admitted). The United States Supreme Court likewise has held that totality-of-the-circumstances is the appropriate test to determine the validity of a juvenile's waiver of constitutional rights. *Fare*, 442 U.S. at 725 ("This totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved. We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so. The totality approach permits -- indeed, it mandates -- inquiry into all the circumstances surrounding the interrogation."); *Gallegos v. Colorado*, 370 U.S. 49, 55 (1962) ("There is no guide to the decision of cases such as this, except the totality of circumstances that bear on the two factors we have mentioned. The youth of the petitioner, the long detention, the failure to send for his parents, the failure immediately to bring him before the judge of the Juvenile Court, the failure to see to it that he had the advice of a lawyer or a friend -- all these combine to make us conclude that the formal confession on which this conviction may have rested * * * was obtained in violation of due process.").

{¶ 33} In performing the totality-of-the-circumstances analysis, the presence or absence of a parent is one factor to be considered in determining the validity of a juvenile's waiver of constitutional rights. *See Barker*, 2016-Ohio-2708, at ¶ 24 ("A juvenile's access to advice from a parent, guardian or custodian also plays a role in assuring that the juvenile's waiver is knowing, intelligent, and voluntary."). *See also A.S.* at ¶ 22 ("The Supreme Court of Ohio did acknowledge the lack of a parent is a factor in determining whether the waiver was knowing, intelligent, and voluntary."); *D.B.*, 2018-Ohio-1247, at ¶ 37 ("The absence of advice from a parent or other interested adult is one factor to be considered in the totality of the circumstances, but is not determinative."). Accordingly, we will consider all the relevant factors in assessing whether N.D. properly waived his rights.

{¶ 34} At the time of the interview, N.D. had completed the ninth grade and could read and write English. The interview video indicates that N.D. was concerned about K.A. and he appeared visibly disturbed when Detective Doersam told him K.A. was in critical condition. However, N.D. did not appear to be so distraught that he could not understand the warnings being given by Detective Doersam. N.D. had prior experience in the juvenile system, having been adjudicated delinquent in a 2018 case. Moreover, there was no

evidence of physical deprivation or mistreatment.  Although N.D. was handcuffed during the interview, at one point Detective Doersam loosened the handcuffs to ensure N.D. was not uncomfortable.  N.D. was given water and was offered food while in the interview room. There was also no evidence of any inducements or threats.  Before he began reviewing N.D.'s constitutional rights, Detective Doersam explained that N.D. could potentially face charges due to the incident:

> DETECTIVE DOERSAM: So, we're just trying to figure out what happened. I'm not saying that you know, I'm not saying you're gonna be charged, you're gonna be arrested. I'm not saying that, but I don't know all the facts yet and I can't promise that you wouldn't ever end up being charged out of this. I mean, obviously, your brother is probably your first concern. But I'm just, just so we're clear, I'm not sure what direction. I'm you are in this police station, you're in handcuffs, you were brought here, it's reasonable you could -
>
> [N.D.]: But why, I mean?
>
> DETECTIVE DOERSAM: - you could, well, here's the thing, I want to get the story from you to see what happened, like even though technically you're not under arrest okay, you're being detained because the way it happened and you could feel like you're arrest, so I'm gonna read you your *Miranda* [r]ights, okay.

(Oct. 4, 2021 Tr. at 41-42.)[2]

{¶ 35} Detective Doersam explained that N.D. had the right to have a parent with him during questioning:

> DETECTIVE DOERSAM: If you're under the age of 18 which you are, you have a right to have your parent or guardian with you during the questioning. Some people might want their parents present, some people don't care, -
>
> [N.D.]: I –
>
> DETECTIVE DOERSAM: - some people would prefer not to have them in the room 'cause it –

---

[2] The sound in the recording of N.D.'s interview was muffled, which was acknowledged at the suppression hearing; however, the court reporter attempted to transcribe the audio portion of the recording. Neither party objected to the transcription being made part of the trial record.

[N.D.]: I would, like if I knew my mom was in the room, 'cause I know she was mad, like –

DETECTIVE DOERSAM: She, my understanding is she's at the hospital.

[N.D.]: Is my little brother okay?

DETECTIVE DOERSAM: I don't -- I don't fully know the status and I don't want [to] spread worry. I do know he was at least initially in very critical condition, but that doesn't, that does not automatically mean fatal. You know what fatal means?

[N.D.]: Critical condition (inaudible) means.

* * *

[N.D.]: Is my dad still here?

DETECTIVE DOERSAM: I think your dad's with your brother, which but I could be wrong or his uncle, if you guys have the same uncle, right?

[N.D.]: Oh, he already left, my brother already left?

DETECTIVE DOERSAM: I don't know. He -- someone gave your brother clothes whether it was your uncle or your dad.

[N.D.]: (Inaudible).

DETECTIVE DOERSAM: I didn't talk to him. I didn't see him. I'm giving you (inaudible).

[N.D.]: He had a little brother.

DETECTIVE DOERSAM: There was a little kid in our lobby.

[N.D.]: That's my dad.

DETECTIVE DOERSAM: Okay. So, I got to get through this first off and then if you have any questions or anything, we'll talk so –

[N.D.]: Okay.

DETECTIVE DOERSAM: - if you're under the age of 18, you have the right to have a parent or guardian during your

> questioning. You can decide at any time to exercise these ri --
> rights and not answer questions and make any statements.

(Oct. 4, 2021 Tr. at 45-47.)  Although Detective Doersam twice told N.D. that he had the right to have a parent present and told him that his father was at the police station, N.D. did not ask to speak to his father or request that his father be brought to the interview room.

{¶ 36} We note that Officer Patterson reported that N.D. "asked to speak to a detective and his mother regarding the incident" while waiting to be interviewed.  (Trial Ex. A, Officer Patterson narrative.)  However, N.D. did not ask to speak with his mother after Detective Doersam explained that he could have a parent present during the interview.  Taken in context, N.D.'s comment to Detective Doersam about his mother was equivocal at best, suggesting he was concerned that she would be angry with him.  Additionally, although N.D. asked if his father was present at the police station, he did not request to speak with his father before agreeing to participate in the interview.  Under these circumstances, we cannot conclude that the lack of consultation with a parent before waiving his constitutional rights necessarily prevented N.D.'s waiver from being made voluntarily, knowingly, and intelligently.[3]

{¶ 37} As in *D.B.* and *A.S.*, in this case N.D. appeared to understand his constitutional rights as Detective Doersam was explaining them.  Unlike the *D.F.* case, there was no indication of deceptive or misleading statements, nor any coercive tactics used toward N.D.  Considering the totality of the circumstances, we conclude N.D. voluntarily, knowingly, and intelligently waived his constitutional rights.

{¶ 38} Accordingly, we overrule appellant's first assignment of error.

---

[3] The juvenile court magistrate indicated he was concerned that N.D.'s father was not included in the interview. The juvenile court judge similarly found it "quite troubling that a parent was at the police station and was not invited to participate in the interview process." (Aug. 16, 2022 Decision at 6.) Notwithstanding these concerns, both the magistrate and the juvenile court judge ultimately found that N.D. waived his rights voluntarily, knowingly, and intelligently. Under circumstances such as those occurring in this case it may be considered a better practice for an interrogating officer to directly and expressly ask whether a juvenile wishes to have a parent or guardian present during the interview or to speak with a parent or guardian before participating in an interview. However, as explained in this decision, the Federal Constitution, the Ohio Constitution, and Ohio law presently do not require a police officer to take such measures. Therefore, the issue of whether to provide enhanced protections during police interviews of juveniles remains a matter of policy to be determined by appropriate policymakers.

## C. Sufficiency of the evidence

{¶ 39} N.D. argues in his second assignment of error that the evidence was insufficient to sustain a conviction for reckless homicide. He claims the trial court erred by concluding he acted recklessly as opposed to negligently.

### 1. Standard of review

{¶ 40} Sufficiency of the evidence is a legal standard that tests whether the evidence is legally adequate to support a verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). In evaluating the sufficiency of the evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 34. A verdict will not be reversed based on insufficient evidence unless, after viewing the evidence in the light most favorable to the state, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact. *State v. Aekins*, 10th Dist. No. 21AP-630, 2023-Ohio-322, ¶ 71, citing *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

### 2. Reckless homicide versus negligent homicide

{¶ 41} N.D. was found to have violated R.C. 2903.041(A), which provides in relevant part that "[n]o person shall recklessly cause the death of another." "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist." R.C. 2901.22(C). A "[s]ubstantial risk" is "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8). "A mere failure to perceive or avoid a risk, because of a lack of due care, does not constitute reckless conduct." *State v. Peck*, 172 Ohio App.3d 25, 2007-Ohio-2730, ¶ 12 (10th Dist.). "Instead, one must recognize the risk of the conduct and proceed with a perverse disregard for that risk." *Id.*

{¶ 42} R.C. 2903.05(A) provides in relevant part that "[n]o person shall negligently cause the death of another * * * by means of a deadly weapon or dangerous ordnance as

defined in [R.C. 2923.11]." "A person acts negligently when, because of a substantial lapse from due care, the person fails to perceive or avoid a risk that the person's conduct may cause a certain result or may be of a certain nature. A person is negligent with respect to circumstances when, because of a substantial lapse from due care, the person fails to perceive or avoid a risk that such circumstances may exist." R.C. 2901.22(D). A "[r]isk" is "a significant possibility, as contrasted with a remote possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(7).

{¶ 43} This court addressed the distinction between recklessness and negligence in the *Peck* case:

> The difference between the terms "recklessly" and "negligently" is normally one of a kind, rather than of a degree. "Each actor creates a risk of harm. The reckless actor is *aware* of the risk and disregards it; the negligent actor is *not aware* of the risk but should have been aware of it."

(Emphasis sic.) *Peck* at ¶ 13, quoting Wharton's Criminal Law, 15th Ed., Section 27, at 170. "Correctly identifying the nature of the risk is critical in determining whether [a defendant's] conduct was reckless." *Id.* at ¶ 15. "[A] court must assess the defendant's knowledge of the *specific* risk created by the defendant's conduct, not the defendant's knowledge of the general risk inherent in the activity, in determining criminal liability for reckless homicide." (Emphasis added.) *Id.* at ¶ 17.

**3. Analysis of the evidence in this case**

{¶ 44} N.D. told Detective Doersam that he placed the gun on the floor behind him and covered it with a pillow, and that he was using his phone while facing away from the door. N.D. admitted he knew there were rounds in the magazine, which was in the gun. N.D. also admitted the door to his bedroom was not secured or blocked. Thus, the specific risk created by N.D.'s conduct was that one of his younger brothers would enter the room, access the loaded gun, and harm himself or someone else before N.D. could stop him. *See Peck* at ¶ 18 (concluding in a case involving an attempt to tow a tractor-trailer out of a highway median that the specific conduct was the use of an insufficient snatch block, which created a specific risk that the snatch block would fail during the attempted tow).

{¶ 45} N.D. argues that his actions were merely negligent—i.e., that he should have been aware of the risk but failed to perceive it. Viewing the evidence in the light most

favorable to the state, as we must in a sufficiency review, we conclude that a rational trier of fact could have found that N.D. recognized the risk of his conduct and proceeded with a perverse disregard for that risk. N.D. asserted that he generally told his little brothers to stay out of his bedroom because there was "stuff" in there. (Dec. 15, 2021 Tr. at 39.) When asked what "stuff" meant, N.D. responded "everything," suggesting he knew that there were items that were hazardous to his younger brothers in his room. (Dec. 15 2021 Tr. at 39.) However, N.D. did not claim to have specifically warned or reminded his brothers to stay out on the evening of the incident. He also admitted that he usually blocked the bedroom door with a broken piece of a table, but he did not do so on the night of the incident, despite the fact that he was facing away from the door. Moreover, N.D. told Detective Doersam that he believed the bedroom door was open after he returned from downstairs. This indicates N.D. did not even take the minimal step of closing the bedroom door before turning his back to it and focusing his attention on his phone. N.D. admitted there was a high shelf in his closet, but he did not attempt to secure the gun in the closet. Likewise, N.D. did not remove the magazine, which he knew was loaded, when he took the gun out of his pocket. Instead, N.D. placed the loaded gun on the floor and merely covered it with a pillow.

{¶ 46} Citing multiple other cases, N.D. argues that reckless homicide convictions arising from accidental shootings usually occur when the defendant was the individual who caused the gun to fire. The fact that courts have found reckless conduct under those circumstances, however, does not preclude a finding of recklessness in this case, even if N.D. was not the individual who pulled the trigger.

{¶ 47} Based on our review of the evidence, when viewed in the light most favorable to the state, we conclude that a rational trier of fact could have concluded that N.D. was aware of the specific risk arising from placing a loaded gun on the floor of his room, covered only by a pillow, when the door was not closed or secured and he was facing away from the door with his attention diverted by his phone, and that N.D. acted with perverse disregard for that risk on the night of the incident.

{¶ 48} Accordingly, we overrule N.D.'s second assignment of error.

## IV. Conclusion

{¶ 49} For the foregoing reasons, we overrule N.D.'s two assignments of error and affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

EDELSTEIN, J., concurs.
MENTEL, P.J., concurs.

MENTEL, P.J., concurring.

{¶ 50} I fully concur with the majority as to both assignments of error. The majority's decision is thorough and supported by ample state and federal case law. I write separately, however, to encourage the General Assembly to enact meaningful protections for minors during police interrogations and to offer that discretion is available to law enforcement to allow parents to be present during the interrogation of a minor.

{¶ 51} As the majority sets out, while some states employ a per se approach when determining the validity of a juvenile's waiver of their *Miranda* rights, Ohio has elected not to provide such a protection. *Supra* at ¶ 31. Instead, we utilize a totality of circumstances test to assess the legitimacy of the juvenile's waiver. *Id.* at ¶ 32. The totality of the circumstances test, however, fails to appropriately account for the developing cognitive abilities of minors. Legal scholarship on the subject has noted the decision-making skills of juveniles are not fully formed and lack the "understanding of the possible consequences that could ensue from unskilled, unrepresented interactions with the criminal legal system." Lucy Litt, *Underage and Unprotected: Federal Grand Juries, Child Development, and The Systemic Failure to Protect Minors Subpoenaed as Witnesses*, 92 U.Cin.L.Rev. 89, 109-10 (2023). To be sure, at least one study has found that certain developmental processes remain incomplete in individuals even into their mid-20s. Hayley M.D. Cleary, *Applying the Lessons of Developmental Psychology to the Study of Juvenile Interrogations: New Directions for Research, Policy, and Practice*, 23 PSYCH., PUB. POL'Y, & L. 118, 119 (2017).

{¶ 52} The very nature of a police interrogation is a highly coercive process that creates and exploits power imbalances. Lucy Litt at 110, citing Saul M. Kassin & Gisli H. Gudjonsson, *The Psychology of Confessions: A Review of the Literature and Issues*, 5

PSYCH.SCI.PUB.INT. 33, 41-42 (2004).  Minors are even more vulnerable to these tactics than adults.  "Research indicates that juveniles as a class tend to waive their *Miranda* rights at a significantly higher rate than adults.  Empirical studies have found that over 90% of juveniles eventually choose to waive their *Miranda* rights."  (Emphasis omitted.)  Sam Yousif, *Protecting Justice: Juveniles and the Coercive Environment of Police Interrogations*, 95 U.Det.Mercyl.Rev. 517, 527 (2018), citing Barry C. Feld, *Behind Closed Doors: What Really Happens When Cops Question Kids*, 23 Cornell J.L. & Pub.Pol. 395, 429 (2013).  This can be explained as "the decision-making and risk-assessment skills of minors are not fully formed; this means that they have difficulty anticipating the long[-]term consequences of their decisions, weighing alternatives, and navigating hypothetical questions."  Lucy Litt at 111.

{¶ 53} Putting aside the need for protecting minors based on their inherent psychosocial and cognitive vulnerabilities, the practical consequence of interrogating minors outside the presence of a parent or attorney is the increased risk of false confessions.  Ariel Spierer, *The Right to Remain a Child: The Impermissibility of the Reid Technique in Juvenile Interrogations*, 92 N.Y.U.L.Rev. 1719, 1741 (2017) (Emphasis omitted.) ("youthful suspects [are] particularly susceptible to the 'inherently distressing' conditions of police interrogations, and thus more likely to make false confessions."); Sam Yousef at 534, citing Steven A. Drizin & Richard A. Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C.L.Rev., 891, 944 (2004).  In one study, minors under 18 years of age made up 33 percent of the 125 known false confessions.  Drizin & Leo at 944. Of the juveniles in the study "the vast majority of juvenile false confessors in [the] sample (33/40) [were] ages fourteen to seventeen, the age range at which many alleged juvenile offenders are tried as adults."  *Id.* at 944.  The United States Supreme Court has recognized the heightened risk of false confessions from minors yet has not extended per se protections in the Fifth Amendment context.  *See J.D.B. v. North Carolina*, 564 U.S. 261, 269 (2011) ("That risk is all the more troubling--and recent studies suggest, all the more acute--when the subject of custodial interrogation is a juvenile.").  In states that impose per se restrictions, the minor is offered some inherent protections from incidentally providing a false confession.  When enhanced protections are provided, law enforcement is not diverted in their investigation with a false confession and can continue to pursue the culpable party.

{¶ 54} Many state legislators have created a presumption that a minor under a certain age cannot waive their *Miranda* rights or that the waiver is not permitted without the opportunity to consult with a parent or attorney. *See* Hillary B. Farber, *Do You Swear to Tell the Truth, The Whole Truth, and Nothing But the Truth Against Your Child?,* 43 Loy.L.A.L.Rev. 551, 584 (2010). At least 19 states provide some form of increased protection for minors in this context. Maxwell Fabiszewski, *Major Reforms for Minors' Confessions: Rethinking Self-Incrimination Protections for Juveniles*, 61 B.C.L.Rev. 2643.[4] The geographic diversity of the states that offer these enhanced protections is telling

---

[4] These jurisdictions are Arkansas, California, Colorado, Connecticut, Illinois, Indiana, Iowa, Kansas, Massachusetts, Missouri, Montana, New Mexico, North Carolina, North Dakota, Oklahoma, Texas, Vermont, Washington, and West Virginia. See ARK. CODE ANN. § 9-27-317 (West 2019) (restricting juvenile waiver of counsel in juvenile proceedings); CAL. WELF. & INST. CODE § 625.6 (West 2019) (forbidding waiver of any *Miranda* rights by juveniles younger than sixteen years old and mandating that failure to give juveniles such opportunity be considered in evaluating admissibility of statements); COLO. REV. STAT. ANN. § 19-2-511 (West 2019) (providing that statements by juveniles in custodial interrogation are inadmissible unless juveniles and their parents/guardians were present and informed of their rights, but allowing juveniles and their parents/guardians to expressly waive this requirement after advisement); CONN. GEN. STAT. ANN. § 46b-137 (West 2019) (disallowing waiver of any *Miranda* rights by juveniles less than sixteen years old in delinquency proceedings); 705 ILL. COMP. STAT. ANN. § 405/5-170 (West 2019) (requiring juveniles under the age of fifteen to have legal representation throughout custodial interrogations in delinquency proceedings for crimes that, if committed by an adult, would qualify as enumerated felonies); IND. CODE ANN. § 31-32-5-1 (West 2019) (requiring counsel or parental/guardian consent to a child's waiver of constitutional rights if the child is not emancipated); IOWA CODE ANN. § 232.11 (West 2019) (providing that juveniles less than sixteen years old cannot waive their right to counsel in custodial interrogation without the written consent of a parent/guardian); KAN. STAT. ANN. § 38-2333 (West 2019) (barring the admissibility of statements by juveniles less than fourteen years old not made after consultation with the juvenile's parent or counsel); MO. ANN. STAT. § 211.059 (West 2019) (adding the right to have a parent/guardian present during any custodial interrogation to the warnings due to a juvenile prior to such proceedings); MONT. CODE ANN. § 41-5-331 (West 2019) (mandating that juveniles less than sixteen years old have a parent/guardian or counsel's consent to waive the right to counsel in custodial interrogation); N.M. STAT. ANN. § 32A-2-14 (West 2019) (providing that any statements by juveniles less than thirteen years old are inadmissible and that a rebuttable presumption of inadmissibility attaches to statements given by a thirteen- or fourteen-year-old juvenile to any person in a position of authority); N.C. GEN. STAT. ANN. § 7B-2101 (West 2019) (requiring the presence of a parent/guardian or counsel for any statements by juveniles less than sixteen years old in custodial interrogation to be admissible); N.D. CENT. CODE § 27-20-26 (West 2019) (requiring a parent's presence for all juveniles to waive right to counsel); OKLA. STAT. ANN. tit. 10A, § 2-2-301 (West 2019) (providing that a parent/guardian or counsel must be present for any statements by those less than sixteen years old in custodial interrogation to be admissible); TEX. FAM. CODE ANN. §§ 51.09-51.10 (West 2019) (requiring that waivers of constitutional rights by juveniles be in writing and made by both juveniles and their counsel); WASH. REV. CODE ANN. § 13.40.140 (West 2019) (requiring a parent's consent for waivers of juveniles under twelve); W. VA. CODE ANN. § 49-4-701(l) (West 2019) (providing that statements, other than res gestae, made to law enforcement or in custody by juveniles are inadmissible if: made by those thirteen years old and younger and not made in the presence of a juvenile's counsel; or made by those fourteen to sixteen years old and not made in the presence of counsel or parents/custodians informed of the juvenile's rights); *Commonwealth v. Smith*, 28 N.E.3d 385, 388-90 (Mass. 2015) (mandating that children under the age of fourteen require parental presence to waive, and those between fourteen and eighteen are exempt from this requirement only if there is a particular finding of intelligent understanding on behalf of the juvenile); *In re E.T.C.*, 449 A.2d 937, 939-40 (Vt. 1982) (requiring that juveniles have the opportunity to consult with an interested adult who is

as it underscores the breadth of jurisdictions that have recognized the need to provide meaningful safeguards for minors in this space.

{¶ 55} In other settings, the Ohio General Assembly has recognized the need to create per se age restrictions in the interests of protecting minors. *See, e.g.,* R.C. 2907.04(A) ("No person who is eighteen years of age or older shall engage in sexual conduct with another when the offender knows the other person is thirteen years of age or older but less than sixteen years of age."); R.C. 3321.01(A)(1) ("A child between six and eighteen years of age is 'of compulsory school age' for the purpose of sections 3321.01 to 3321.13 of the Revised Code."); R.C. 3503.011 ("At a primary election every qualified elector who is or will be on the day of the next general election eighteen or more years of age, and who is a member of or is affiliated with the political party whose primary election ballot he desires to vote, shall be entitled to vote such ballot at the primary election."); R.C. 3911.08 (the legal disability of minors over fifteen years of age is removed concerning contracts of life insurance); R.C. 4507.05 (permitting the BMV to issue a temporary instruction permit and temporary instruction identification card to a person at least fifteen years six months of age but less than sixteen years of age to drive a motor vehicle under certain circumstances). Given the above scholarship regarding the cognitive development of minors and the dangers of false confessions, it would behoove the General Assembly to adopt a per se approach, or at the very least meaningful procedural safeguards, for minors during police interrogations.

{¶ 56} Even if the political realities of the world make reform in this area of the law unrealistic, at minimum, law enforcement should exercise discretion when interrogating minors without a parent or attorney present. As the majority explains, N.D., at various points during his detention and interrogation, inquired whether his mother and father were present. *Supra* at ¶ 6-7. While the record is admittedly foggy, we know N.D.'s father was at the police station at some point during the interrogation. The detective conceded that he knew that the father was at the police station, yet he elected to proceed with his interrogation of N.D. without an attorney or parent present. *Id.* at ¶ 30. It is difficult to not view the detective's interrogation as a deliberate attempt to isolate a 15-year-old minor in

---

independent from the prosecution and understands the juvenile's rights before juveniles can waive their Miranda rights). (Emphasis omitted.) *Id.* at fn. 276.

order to obtain a confession.  To be sure, the facts of this case are horrific and deserve diligent investigation by law enforcement.  However, there were no exigent circumstances in this matter that required the immediate interrogation of N.D.  Having the legal authority to interrogate a minor outside the presence of a parent does not compel the exercise of that authority categorically.

{¶ 57}  While the majority reaches a similar conclusion, *see supra* ¶ 36, fn. 3, I write separately to underscore that, while law enforcement possesses the authority to interrogate minors outside the presence of their parents, they also possess the discretion to allow parents to be present during an interrogation.  This discretion exists notwithstanding a minor's failure to explicitly state such a request.  A maxim of law states, "*discretio est discernere per legem quid sit justum,*" discretion is to know through law what is just.

———